759 F.2d 466
 1986 A.M.C. 137
 BLACK GOLD MARINE, INC., and Employers Insurance of Wausau,
A Mutual Co., Plaintiffs-Appellees,
v.
JACKSON MARINE COMPANY, INC. and M/V MISTER JEAN, and her
Crew of July 14, 1981, Including Richard G.
Trudell, Her Master, Defendants-Appellants.
 No. 83-3340.
 United States Court of Appeals,
Fifth Circuit.
 May 6, 1985.
 
 Flaudry G. Mooney, Overton T. Harrington, Jr., Lester J. Waldmann, Gretna, La., William D. Nelson, Brown & Root, Houston, Tex., for defendants-appellants.
 Lawrence E. Abbott, Steven K. Best, New Orleans, La., for plaintiffs-appellees.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before GOLDBERG, POLITZ and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 Appellee Black Gold Marine, Inc. instituted this declaratory judgment action to determine the validity of a contract between it and appellant Jackson Marine Co. which required, among other things, Black Gold to arbitrate in London, England, a salvage claim made by Jackson. At the conclusion of the bench trial, the district court found that Jackson had fraudulently procured the contract and that Black Gold had not ratified the contract. The court accordingly declared the agreement null and void and entered judgment for Black Gold. We hold that the findings of the district court of fraud and nonratification are not clearly erroneous, and we therefore affirm.
 
 I.
 
 2
 The following recital of the facts is taken from both the district court's findings of facts and the testimony adduced at trial. At about 6:45 p.m. on July 14, 1981, a fire erupted in the engine room of one of Black Gold's ships, the M/V BLUE FOX, while the vessel was operating in the Gulf of Mexico near the Texas coast. The BLUE FOX was carrying canisters of compressed acetylene and oxygen that presented a high risk of a serious explosion. The crew was unsuccessful in extinguishing the fire, and they abandoned ship and were rescued by a nearby boat. Eventually, they reached another nearby boat, the M/V VIGALANTE FORCE, and they began radioing for help.
 
 
 3
 A vessel owned by Jackson Marine, the M/V MISTER JEAN, received the distress signals and came to the scene. At around 10:30 p.m., the crew of the MISTER JEAN began extinguishing the fire. Because of the MISTER JEAN's enormous fire-fighting capabilities, the crew had the fire under control by around 11:00 p.m. After the fire was under control, the captain of the MISTER JEAN, Captain Trudell, notified the captain of the VIGALANTE FORCE that he wished to speak with the captain of the BLUE FOX, Captain Totten. Captain Totten made his way to the MISTER JEAN and reported to the wheelhouse where he met Captain Trudell. Captains Trudell and Totten then exchanged pleasantries for approximately fifteen minutes. At this point, the version of the events becomes disputed.
 
 
 4
 Captain Totten testified that Captain Trudell offered to tow the BLUE FOX, since the BLUE FOX's engines were inoperable, and that he accepted Trudell's offer. Captain Trudell then presented Captain Totten with a four-page document entitled: "Standard Form of Salvage Agreement (Approved and Published by the Committee of Lloyd's) No Cure-No Pay," and described the document as a standard towing form. The document actually provided in less than clear language that Jackson Marine would be entitled to recover the value of the MISTER JEAN's services in extinguishing the fire and that the value of these services would be determined by the Lloyd's Salvage Arbitration Board in London, England. Although he had served as a captain for about two years, Captain Totten had never before seen this type of document. He read the first page and scanned the remaining three pages, but he could not understand the language in the document because it was written in "lawyer talk". Trudell expressly assured him that the document was designed to limit Jackson's liability for any damage to the BLUE FOX that resulted from the tow. Trudell never mentioned either that he expected to be paid for the services rendered in saving the BLUE FOX or that he intended to file a salvage claim in London against the BLUE FOX for these services.
 
 
 5
 Captain Totten then used the radio on board the MISTER JEAN and contacted the captains of nearby vessels to learn if any had knowledge of the purpose or significance of the document. All of the captains told him that they had not heard of the document but that it seemed reasonable for a rescuing ship to seek to limit its liability when it aided another ship in peril. After speaking with these other captains, Totten signed the document with the understanding that the document merely would relieve Trudell and Jackson Marine of liability during towing. Totten returned the only copy of the document to Trudell, and Totten and Trudell never mentioned the document again.
 
 
 6
 About an hour after Trudell and Totten signed the document, Trudell received word from his superiors denying him permission to tow the BLUE FOX. He was instructed, instead, to proceed to his original destination. Another vessel then towed the BLUE FOX to safety. Captain Totten assumed that the document he had signed was a nullity because Trudell did not provide the towing service he had promised. Other disinterested witnesses who testified at trial and were privy to some of the conversations between Totten and Trudell corroborated those aspects of Totten's testimony which asserted that the contract discussions involved merely towing the BLUE FOX and holding Jackson Marine harmless for any damage the BLUE FOX sustained during towage.
 
 
 7
 Naturally, Trudell's version of the facts differs. Trudell testified that he handed Totten the document and said: "This is a Lloyd's open form salvage agreement," and that Totten accepted the document and asked no questions about it. Captain Trudell departed from the wheelhouse to supervise his crew while Totten remained inside and examined the document for about fifteen to twenty minutes. When Trudell returned to the wheelhouse, Totten asked Trudell whether the MISTER JEAN could tow the BLUE FOX to safety, and if so whether Jackson Marine would be liable for any damage to the BLUE FOX during towage. Trudell responded that the document would relieve Jackson of any such liability. At another point in his trial testimony, however, Trudell conceded that Totten had asked him what the document covered and that he reiterated that the document, in part, was designed to absolve Jackson of liability for damages to either the vessel during towage or the cargo if the fire flared up again. Trudell explained at trial that he said this because at that time he was particularly concerned about the prospect of throwing the acetylene and oxygen canisters overboard if the fire burst out again. Finally, Trudell testified that before Totten signed the document, he told Totten that Jackson would expect remuneration for the services performed by the crew of the MISTER JEAN for the BLUE FOX. There was no testimony from other witnesses corroborating the critical aspects of Captain Trudell's testimony, especially Trudell's claim that he had told Totten that Jackson would expect to receive compensation for the services of the MISTER JEAN and her crew.
 
 
 8
 Approximately two weeks after the fire, in late-July 1981, Black Gold received notice from the Lloyd's Salvage Arbitration Board that Jackson Marine asserted a substantial salvage claim against it under the salvage contract. In late August, Captain Totten met with Black Gold attorneys and related his version of the facts to them. On October 5, 1981, Black Gold instituted this action in the Eastern District of Louisiana, seeking to declare the salvage contract void.
 
 
 9
 In the meantime, however, between September 10, 1981, and September 16, 1981, the parties exchanged a series of telexes concerning a security bond. Prior to the exchange of the telexes, Jackson apparently had contacted Black Gold and threatened to exercise its right under general maritime law to arrest the BLUE FOX pending resolution of its salvage claim. Understandably, Black Gold was concerned about Jackson's contemplated seizure of the BLUE FOX, since seizure would have resulted in substantial income loss to Black Gold. On September 10, 1981, Black Gold's New Orleans counsel telexed Jackson's counsel in London and informed them that Jackson need not consider arresting the BLUE FOX, since Black Gold was willing to post a security bond. Black Gold's counsel also indicated that Black Gold's insurer desired to be heard in the arbitration matter. During the next few days, the parties exchanged additional telexes. Black Gold emphasized its desire and intent to post a security bond in lieu of seizure, and it continued to request that Jackson inform it of the amount of security Jackson desired. On September 16, 1981, Jackson demanded from Black Gold a $500,000 security bond. Black Gold did not undertake the security bond, and explained to the district court below that it considered such a demand to be outrageous. Shortly thereafter, Black Gold instituted this suit.
 
 
 10
 In the proceeding below, the district court concluded that Trudell fraudulently procured the salvage contract by misstating the nature, purpose, and effect of that document. The district court also found that Trudell, a captain of twenty years, was intimately familiar with the terms and effect of the salvage agreement, whereas Captain Totten had neither seen nor heard of the document before, and that Trudell dishonestly mischaracterized the document to secure Totten's signature. The district court also rejected Jackson's claim that Black Gold ratified the contract because it failed timely to rescind and because it continued proceeding with the arbitration matter in London.
 
 II.
 
 11
 A. Fraudulent Procurement of the Salvage Contract
 
 
 12
 It is well-settled that an admiralty court possesses authority to set aside a salvage contract that was procured through the salvor's misrepresentations or because of a mutual mistake of a material fact. See THE ELFRIDA, 172 (15 Pet.) U.S. 186, 192, 19 S.Ct. 146, 148, 43 L.Ed. 413 (1898); Houseman v. THE NORTH CAROLINA, 40 U.S. 40, 47, 10 L.Ed. 653 (1841); THE THORNLEY, 98 Fed. 735, 741 (5th Cir.1899); THE CLANDEBOYNE, 70 Fed. 631, 636 & 637 (4th Cir.1895); Treasurer Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, 459 F.Supp. 507, 522 (S.D.Fla.1978), aff'd on other grounds, 621 F.2d 1352 (5th Cir.1980), aff'd in part, rev'd in part, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982). Admiralty courts traditionally have applied common law factors to determine if fraud has been perpetrated in consummating a salvage contract. See THE CLANDEBOYNE, supra, 70 Fed. at 634; see also 3A M. Norris, Benedict on Admiralty Sec. 166, at 12-11 (6th ed. 1983). To prevail on a claim that a contract was fraudulently procured, the party that was deceived must show that (1) the deceiving party made a material misrepresentation or nondisclosure, (2) the representation was false or the nondisclosure implied that the facts were different from what the deceived party understood them to be, (3) the deceiving party knew that the representation was false or that the nondisclosure implied the existence of false facts, (4) the deceiving party intended the deceived party to rely on the misrepresentation or nondisclosure, and (5) the deceived party detrimentally relied upon the misrepresentation or nondisclosure. See South Hampton Co. v. Stinnes Corp., 733 F.2d 1108, 1120 (5th Cir.1984); Shores v. Sklar, 647 F.2d 462, 468 (5th Cir.1981), cert. denied, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); Hauben v. Harmon, 605 F.2d 920, 923 & 924 (5th Cir.1979); see also Restatement (Second) of Contracts Secs. 159-164 (1981).
 
 
 13
 In this appeal, Jackson levels a vigorous challenge against the district court's finding that Trudell fraudulently procured the instant contract from Totten. The district court's finding of fraudulent procurement, however, is a finding of fact, subject to the clearly erroneous standard of Fed.R.Civ.P. 52(a). See United States v. Fernon, 640 F.2d 609, 613 (5th Cir.1981); see also Vicon, Inc. v. C.M.I. Corp., 657 F.2d 768, 771, 774 & 775 (5th Cir.1981); Funding Systems Leasing Corp. v. Pugh, 530 F.2d 91, 94 (5th Cir.1976). A finding is clearly erroneous only if the appellate court, upon examining the entire record, is left with a definite and firm conviction that a mistake has been made. Williams v. Reading & Bates Drilling Co., 750 F.2d 487, 489 (5th Cir.1985); Ayers v. United States, 750 F.2d 449, 456 (5th Cir.1985).
 
 
 14
 To address Jackson's contentions, we need not detail all of the district court's factual findings related to the fraudulent procurement issue. Suffice it to say, the district court obviously credited Captain Totten's partially corroborated testimony and accepted Totten's version of the facts. Assessing the credibility of the witnesses is a task entrusted exclusively to the finder of fact. Hindman v. City of Paris, Texas, 746 F.2d 1063, 1068 (5th Cir.1984); Intentional Therapeutics, Inc. v. McGraw-Edison Co., 721 F.2d 488, 491 (5th Cir.1983). The record contains adequate evidence, if credited, to support the district court's findings on each of the elements of the fraudulent procurement claim. We therefore are not left with a definite and firm conviction that a mistake has been committed, and the district court's finding of fraudulent procurement is not clearly erroneous.[1]B. Ratification of the Salvage Contract
 
 
 15
 In an attempt to salvage the contract, Jackson argues that Black Gold ratified the voidable contract by corresponding with Jackson's London counsel after Jackson initiated the arbitration proceeding with the Lloyd's Salvage Arbitration Board. To establish ratification, Jackson must show that Black Gold, while possessing knowledge of all of the facts related to Trudell's misrepresentation, delayed unreasonably in asserting its right to rescind the contract or exhibited other conduct indicating its intent to accept the "benefits" of that contract. See Restatement (Second) of Contracts Secs. 7, 380 & 381 (1981); 1 & 1A A. Corbin, Corbin on Contracts Secs. 6 & 228 (1963). As the district court found, no ratification occurred in this case. Black Gold did not delay seeking to rescind the salvage contract, since it instituted proceedings to declare the contract null and void only five weeks after it learned Captain Totten's version of the facts. Nor did any other act by Black Gold demonstrate any intent to ratify the salvage contract. Efforts by Black Gold to prevent Jackson from seizing the BLUE FOX, including Black Gold's correspondence with Jackson's London counsel, obviously were undertaken to protect Black Gold and preserve the status quo. They hardly constituted actions exhibiting a knowing attempt to ratify a voidable contract.[2] The district court correctly concluded that no ratification occurred in this case.
 
 III.
 
 16
 Our decision is limited narrowly to the validity of the Jackson Marine-Black Gold salvage contract. At oral argument, the Court was informed that in a separate action Jackson has asserted a noncontractual, general maritime law salvage claim against the M/V BLUE FOX. That case is pending in the United States District Court for the Eastern District of Louisiana. Our decision, affirming the district court's invalidation of the salvage contract, in no way limits or affects Jackson's undertaking to vindicate its "pure salvage" rights against the M/V BLUE FOX in the absence of a salvage contract. See, e.g., 3A M. Norris, Benedict on Admiralty Sec. 159 (6th ed. 1983).
 
 
 17
 AFFIRMED.
 
 
 
 [1]
 In a lingering challenge to the fraudulent procurement issue, Jackson argues that the district court was not authorized to find fraud where Totten admitted that he did not read all of the provisions of the contract. Jackson's argument places the cart before the horse. While it is true that ordinarily a party who intentionally signs a document is bound by its contents, regardless of whether he read the document, see Donovan v. Mercer, 747 F.2d 304, 308 n. 4 (5th Cir.1984); Quality Foods, Inc. v. U.S. Fire Ins. Co., 715 F.2d 539, 542 (11th Cir.1983), if the party who did not read the document was induced to sign the document through the defendant's fraud or misrepresentation, that party may nevertheless rescind the contract. Kennett-Murray Corp. v. Bone, 622 F.2d 887, 892 (5th Cir.1980). Notwithstanding Totten's apparently meritorious contention that he diligently attempted to ascertain the meaning of the document, therefore, Trudell's fraudulent activities eliminated Totten's need to carefully read the entire document
 
 
 [2]
 The messages between the parties reveal that Black Gold's lawyers were trying to avoid the arrest of the vessel by Jackson Marine, and Black Gold was exploring its rights, obligations, and options under a voidable contract. These messages neither exhibit an intent to ratify a voidable contract nor indicate that Black Gold sought to dupe Jackson into forfeiting its noncontractual salvage rights. Black Gold endeavored to maintain the status quo. It repeatedly offered to post a security bond in order to prevent the seizure of the BLUE FOX, and it asked Jackson to quote an acceptable security bond. Black Gold clearly remained non-committed in any way until it learned the amount of security that Jackson would demand
 We are also unpersuaded that Black Gold's indication in a message to the Lloyd's Salvage Arbitration Board (copy to Jackson Marine) that it requested arbitration is particularly relevant to the ratification issue. This message obviously was designed to protect Black Gold from default if the contract was found to be binding. It also referred again to the matter of a security bond.
 Finally, there is no support in the record for concluding that Black Gold was stalling to remove the BLUE FOX from the scene so that the vessel could not be arrested. Instead, it was awaiting Jackson Marine's security demand. Nor is there any evidence in the record that even suggests that Jackson Marine made any effort to seize the BLUE FOX either after Black Gold failed to post the security it had demanded or after Black Gold instituted this suit.
 In sum, we do not find that Black Gold's conduct amounted to a ratification of the voidable contract. All of the telexes were exchanged over a period of only six days. When Jackson Marine finally notified Black Gold that it would demand a half million dollar bond as security, Black Gold broke off all communications and filed suit within three weeks. Black Gold's conduct appears to have been reasonable under the circumstances, and without the legal effect of ratifying the voidable salvage contract.