**S.T.S. INTERNATIONAL, LTD.,**
**Plaintiff–Appellant,**

v.

**LAUREL SEA TRANSPORT, LTD., et**
**al., Defendants–Appellees.**

No. 90–3447.

United States Court of Appeals,
Fifth Circuit.

June 3, 1991.

John C. Person, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for plaintiff-appellant.

Harvey Gardere Gleason, Douglas L. Grundmeyer and Mark L. Gundlach, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendants-appellees.

Before HENLEY *, KING and GARWOOD, Circuit Judges.

HENLEY, Circuit Judge:

Plaintiff-appellant, S.T.S. International, Ltd. (S.T.S.), filed a Carriage of Goods by Sea Act (COGSA) claim in federal district court alleging a shortage in the delivery of a cargo of crude oil. 46 U.S.C.App. §§ 1300–1315 (1991). S.T.S. claims a shortage of 3,446 barrels of oil out of a cargo of more than 800,000 barrels. S.T.S. sued the vessel, M/V MICHAEL C (vessel), her owners, the defendant-appellee Neptunea Astro Oceanico, S.A. (Neptunea), and her operators, Laurel Sea Transport, Ltd. (Laurel Sea). The case was tried to the bench and the judgment, with prejudice, was rendered against S.T.S.

The case against the vessel was dismissed for lack of jurisdiction, and the cases against Neptunea and Laurel Sea were dismissed with prejudice because the court concluded S.T.S. did not make its prima facie case with respect to the damages issue. S.T.S. appeals only the dismissal of Neptunea. On appeal, S.T.S. argues the district court's findings of fact regarding cargo volume measurements and shortages were clearly erroneous and that the district court erred in concluding S.T.S. had failed to make its prima facie case. We affirm.

FACTS

At first glance this case appeared complex due to the various measurements that were taken and the numerous computations presented to the district court. Upon further review, however, the important facts and issues are pellucid. The vessel received a load of crude oil in Takula, Cabinda, People's Republic of Angola. An ocean bill of lading was issued by Sanangol U.E.E. Luanda and subsequently negotiated to S.T.S. by Crescent Oil & Shipping Services, Ltd. (Crescent). The bill of lading represents title in 819,987 gross/819,660 net barrels of oil which were loaded onto the vessel. The volume is based on a shore meter reading, much like a gas pump, taken at the tanks in Takula.

* Circuit Judge of the Eighth Circuit, sitting by designation.

On board ship and before departure, a ullage measurement, estimating the volume of oil in the ship's tank in much the same way an oil dipstick measures the oil level in the crankcase of an engine, was taken by the ship's crew. This measurement, adjusted for temperature, indicated 823,036 gross barrels of oil. Neither appellant nor appellee had an independent surveyor verify the amount of departure cargo. Additional measurements were taken during the voyage but are not central to the dispute in this case (they merely reinforce the point that there was variation among the cargo measurements taken at different times along the way). The oil was taken to Lake Charles, Louisiana to a Conoco, Inc. (Conoco) facility. Because the waters were too shallow, some of the oil had to be "lightered," or transferred, to another vessel before being discharged to shore. Additional ullage measurements were taken before and after both lightering and discharge, but again these are not central to the dispute.

An independent surveyor measured the oil on board the vessel before lightering using the ullage method. That measurement showed 820,425 gross/817,331 net barrels of oil. Expert testimony by the ship's captain suggested an interim post-lightering, pre-discharge measurement, derived from ullage measurements, of 818,904 gross barrels of oil. Conoco measured the amount discharged using its tank meters. That measurement showed 817,027 gross/813,374 net barrels of oil. The record indicates that Crescent invoiced S.T.S. for the 819,660 net barrels at $16.532 per barrel. The district court found and appellant states in a footnote to its brief that S.T.S. negotiated with Crescent a reduction to the bill of lading of 1,281 barrels for water in the cargo. The district court also found and appellant states in the same footnote that other reductions went to the benefit of S.T.S. for freight left on-board the vessel, amounting to 762 barrels, and for normal evaporation, in the amount of 823 barrels. Conoco paid S.T.S. for 813,374 barrels at $16.827 per barrel.

In its post-trial brief and in this appeal, S.T.S. claims as the shortage the difference between the ullage based gross barrels measured upon departure from Takula, 823,036 barrels, and the captain's estimate of oil before discharge, 818,904 barrels, adjusted for the evaporation of 823 barrels. The difference, precisely 3309.32 barrels, is valued at the price paid by Conoco of $16.827 per barrel, resulting in damages of $55,686.

The district court found no reason to disregard consideration of any of the measurements of cargo taken, with the significant exception of the Conoco shore tank readings. This was so because, among other reasons, Conoco refused to permit the vessel's crew to perform customary line tests during discharge, Conoco exclusively monitored much of the discharge process, a security seal failed on one of the valves leading to the shore tanks, and no one was able to confirm whether any cargo reached one of the shore tanks. In short, there was little independent verification of the results of discharge and of Conoco's shore gauge measurements.

After reviewing the other data and finding it all, for various reasons, equally unpersuasive as to shortage, the court performed its own computation of the cargo volume by averaging all shore and ship measurements. The court estimated an average net volume of 818,472 barrels. When compared to the original bill of lading net barrels the court estimated a shortage of 1,188 barrels, less than the negotiated water reduction to the bill of lading. The district court concluded that S.T.S. had failed to establish any shortage and therefore did not make its prima facie case under COGSA.

## STANDARD OF REVIEW

In COGSA cases involving short delivery, the burden of proof is on the plaintiff to show that a particular cargo was delivered to the carrier in good condition, that it arrived short, and the amount of any damages. *Sun Oil Co. of Pa. v. M/T Carisle*, 771 F.2d 805, 810 (3d Cir. 1985); *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1373 (5th Cir.1979); *Koch Carbon v. Roussel*, Doc. 87-5254, 1990 WL

11357, 5 of 9 (E.D.La. Feb. 1, 1990) (unpublished but available on Westlaw). The bill of lading serves as prima facie evidence of the quantity and quality of goods delivered to the carrier. 46 U.S.C.App. § 1303(4). Presentation of probative evidence by the plaintiff proving damages upon discharge by the carrier is essential to making a prima facie case. *Crisis Transp. Co. v. M/V Erlangen Express*, 794 F.2d 185, 187 (5th Cir.1986).

▮ In a bench trial, the court serves the role of the fact finder. *Elevating Boats, Inc. v. Gulf Coast Marine, Inc.*, 766 F.2d 195, 199 (5th Cir.1985). Decisions regarding the evidence and testimony to be believed or disregarded is left to the fact finder. *Black Gold Marine, Inc. v. Jackson Marine Co.*, 759 F.2d 466, 470 (5th Cir.1985). We will not overturn the district court's findings of fact unless they are clearly erroneous. *Pacific Employers Ins. Co. v. M/V Gloria*, 767 F.2d 229, 235 (5th Cir.1985).

ANALYSIS

▮ S.T.S. argues this appeal presents questions of first impression necessary to decision. We disagree. Simply stated, the district court found, and we agree, that S.T.S. failed to establish its prima facie case on the damages issue. The district court concluded that the starting point for the loss computation was the 819,660 net barrels represented by the bill of lading. This is the amount S.T.S. was originally obligated to pay for, and the bill of lading is prima facie evidence of the amount received by Neptunea.

S.T.S. argues that the ullage measurement of 823,036 taken before departure should serve as the starting point. The district court concluded that the ullage measurement taken before departure was no more or less persuasive than any of the other reliable measurements taken. S.T.S. argues this finding is clearly erroneous because, as a matter of law, otherwise reliable departure and arrival ullage measure-

ments should be considered superior to shore measurements.[1] The district court took into account the presumption in favor of the bill of lading quantity. It also found that the departure ullage measurement was not independently verified or witnessed by a representative of either party. The district court found that the measurements taken throughout the voyage showed variations. It also correctly noted that none of the measuring methods used was based on exact science. The district court believed, and the parties appear to agree, that the various methods result in close estimates at best.

▮ While courts frequently favor ullage measurements, as well as beginning and ending measurements taken by the same method, there is no hard and fast rule. *See, e.g., Insurance Co. of N. Am. v. S/S "Globe Nova"*, 820 F.2d 546, 548 (2d Cir.) (ullage measurements and consistent beginning and ending measurements are generally preferred by courts as the most reliable, unless a court finds otherwise with respect to the reliability or availability of measurement information), *cert. denied*, 484 U.S. 965, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987); *M/T Carisle*, 771 F.2d at 811 n. 11 (courts generally use ullage to ullage measurements to determine carrier loss, but when other measurements are used as best estimates, appellate courts review them as fact findings); *Wesco International v. M/V Tide Crown*, 1985 AMC 189, 197 n. 8 (S.D.Tx.1983) (court used reliable ullage measurements noting that mixing measurement methods would be like comparing apples to oranges); *Amoco Oil Co. v. M/V Lorenzo Halcoussi*, 1984 AMC 1608, 1614–15, 1983 WL 581 (E.D.La.1983) (other measurements used because of reliability problems with ullage measurement). We believe the more flexible rule of allowing the fact finder to consider all relevant and reliable evidence is the better rule, especially given present measurement practices and technology. If a fact finder were to disregard a more reliable method without

---

**1.** Curiously, S.T.S. does not advocate using the departure and arrival ullage measurements suggested by its consistency premise or the case authority it cites. Rather, S.T.S. suggests we use a derived arrival ullage measurement based on pre- and post-lightering measurements.

good reason, an appellate court might well conclude that any affected fact findings were clearly erroneous.

■ We conclude in the present case that it was not clearly erroneous for the district court to find the departure ullage measurement should not be given preference over the amount represented by the bill of lading. The fact finder must evaluate witnesses and other evidence and determine the degree of reliability of each. The district court, we believe reasonably, concluded the Conoco shore measurements were suspect. Considering the other relevant factors before it, the district court also reasonably concluded the ullage measurements in this case were no more reliable than the bill of lading amounts. We see no clear error in these fact findings.

Furthermore, no evidence was presented that S.T.S. had any legal interest in quantities that may have exceeded the 819,660 barrels shown on the bill of lading or that Neptunea was liable under the bill of lading for amounts exceeding the stated barrels. The record clearly reflects that S.T.S. was only obligated to pay for the amounts shown on the bill of lading. S.T.S. profit expectation was based on the bill of lading cargo it purchased, not on some greater amount it only became aware of after the voyage. S.T.S. presented no authority to the district court or to this court to support computing damages on a greater amount of oil than was purchased. These facts reinforce our belief that it was not clear error for the district court to cap the loss computation at the net bill of lading quantity.

Having settled the starting point issue, the only remaining issue is what ending quantity of cargo did Neptunea deliver for discharge to Conoco. The district court found the Conoco shore measurements unreliable, and S.T.S. does not argue that we should use them. The three choices we are left with are the derived quantity suggested by S.T.S. based on the captain's testimony, 818,904 gross barrels, the independent pre-lightering ullage measurement of 820,425 gross/817,331 net barrels, and the district court's average quantity computation of 818,472 net barrels.

The district court, after reviewing the many different measurements and hearing conflicting testimony on adjustments and corrections, concluded that the measurements in this case could be manipulated to reach whatever conclusion the data manipulator chose to assert. For that reason, it performed its own computation as a "test" to determine, on average, what the data revealed. S.T.S. argues the district court's computation is clearly erroneous because it is based on averaging "apples and oranges" and contains mathematical inaccuracies. We will not argue this point because it does not matter. We do not believe the district court performed its computations primarily for the purpose of deriving its own ending cargo amount to refute S.T.S.'s claim for damages, but rather to reinforce its point that S.T.S. had failed to make its prima facie case. Whether the actual measurements of ending cargo were used or some average figure, no shortage had been demonstrated. Therefore, the district court's "testing" computation, while perhaps unnecessary, was not clearly erroneous as used.

Regardless of which measurement is used, the evidence does not demonstrate a COGSA shortage. If we use the ending cargo figure S.T.S. suggests, it concedes that evaporation is properly subtracted from the mathematical difference before determining loss. This concession was given assuming the gross departure ullage measurement was used as the starting point. As stated, the district court determined the net bill of lading quantity was the appropriate starting point in the present case. Thus, we adjust that starting point for the direct concession obtained by S.T.S. from Crescent for water. Other adjustments may or may not be appropriate, but they are not necessary to our analysis. The computation with the water adjustment yields a surplus: 818,904 (ending cargo) − 819,660 (net bill of lading) + 1,281 (water adjustment) = 525 barrel surplus. We believe a surplus would also result if any of the other ending measurements were used, with the exception of

Conoco's, because these computations would include one or more of the water, freight and evaporation adjustments.

Based upon the district court's fact findings which we do not believe are clearly erroneous, we agree with its conclusion of law that S.T.S. did not make its prima facie case because it failed to demonstrate damages due to a shortage actionable under COGSA. The district court opinion suggests, and we are inclined to agree, that the likely cause of this litigation was not what happened between departure and discharge, but before departure and/or during discharge. Given there was no independent verification of how much oil the vessel started with, given the varying measurements throughout the voyage, and given the presumption in favor of the bill of lading, the district court was unpersuaded that more oil existed at departure than was stated on the bill of lading.

Similarly, there was no independent verification of discharged cargo. The source of any loss that S.T.S. may have experienced was in only being paid for 813,374 barrels by Conoco.[2] The evidence adduced by the district court regarding the discharge process suggests many possible problems there. While S.T.S. understandably may be upset by having to pay for more barrels than it was able to sell, it has failed to show that the loss was due to a COGSA shortage and not due to loading or discharge errors of others.

We, therefore, affirm the district court's dismissal with prejudice of the COGSA action against Neptunea because S.T.S. failed to make its prima facie case on damages.

---

2. The record indicates that S.T.S. paid for 819,660 barrels, less the three adjustment amounts totalling 2,866 barrels, at $16.532 per barrel, resulting in an estimated cost of oil of $13,503,238. Conoco paid S.T.S. $16.827 per barrel for 813,374 barrels, resulting in estimated proceeds of $13,686,644.