Charles C. JONES and Clara E. Jones, Plaintiffs–Appellants,

v.

SEA TOW SERVICES FREEPORT NY INC., Defendant–Appellee.

No. 966, Docket 93–7804.

United States Court of Appeals, Second Circuit.

Argued Jan. 14, 1994.

Decided July 25, 1994.

Frederick A. Lovejoy (Bigham, Englar, Jones & Houston, New York City, of counsel), for plaintiffs-appellants.

Thomas F. Daly (McCarter & English, Newark, NJ, of counsel), for defendants-appellees.

Before: MINER and MAHONEY, Circuit Judges, and RESTANI, Judge.*

MINER, Circuit Judge:

Plaintiffs-appellants Charles C. Jones and Clara E. Jones, his wife, appeal from an order entered in the United States District Court for the Eastern District of New York (Glasser, J.) denying their motion for summary judgment in their declaratory judg-

ment action against defendant-appellee Sea Tow Services Freeport NY, Inc. ("Sea Tow") and staying the action pending arbitration in England. By their complaint, Mr. and Mrs. Jones sought a declaration of their rights and responsibilities under a Lloyd's Standard Form of Salvage Agreement, also known as Lloyd's Open Form ("LOF"). Sea Tow has counterclaimed for salvage fees claimed to be due and owing under the LOF.

In arriving at its conclusion, the district court determined that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, New York, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (1970) ("Convention"), as implemented by the provisions of 9 U.S.C. §§ 201–208 (1988), applies to the LOF. According to the district court, the LOF provision for arbitration in England under English law provides a reasonable relation with a foreign state sufficient to allow arbitration to proceed under the Convention and the LOF. We think that the district court exceeded its jurisdiction in directing arbitration to proceed in England. We rest our conclusion on the fact that the parties to this action are U.S. citizens engaged in a purely domestic salvage dispute. In such circumstances, the relation with a foreign state that is required to invoke the Convention is lacking, despite the provisions in the LOF for arbitration in London under the English law of salvage.

## BACKGROUND

The circumstances giving rise to this litigation comprise a cautionary tale for the owners of small vessels in distress. The lesson to be learned is that pleasure craft are just as much subject to the law of the sea, including the law of salvage, as their ocean-going commercial counterparts. The saving grace in this case is that the plaintiffs will be able to defend in the United States, rather than in a foreign forum, the salvage claim asserted against them.

Mr. and Mrs. Jones were the owners of the MISS JADE II, a thirty-three-foot pleasure craft whose home port was Freeport, New York. They apparently navigated the vessel

* Honorable Jane A. Restani, United States Court of International Trade, sitting by designation.

too close to shore while on a voyage from Essex, Connecticut to Freeport on August 20, 1991. At some point during this navigation, the vessel was struck by a wave and rolled over, landing on Atlantic Beach, Long Island at about 8:30 p.m. on a cold and rainy night. Mr. and Mrs. Jones were assisted to shore by a passerby, who tied a line to the MISS JADE II to prevent her from drifting and then telephoned the Nassau County Police Department for assistance. Earlier, Mr. Jones had communicated with the Coast Guard by radio from his vessel regarding the situation. After determining that the Joneses were not seriously injured, the Coast Guard contacted Sea Tow, a professional salvage company.

The first to arrive at the scene was Officer Daly of the Nassau County Police Department. He attended to Mr. and Mrs. Jones, who had sustained minor injuries. He took Mrs. Jones into the police car to shelter her from the rain and cold. Thereafter, Captain Raia and Michael Marsh of Sea Tow arrived, and Marsh set the vessel's anchor to prevent drifting. Officer Daly then left the scene, whereupon Mr. and Mrs. Jones entered "Mobile I," a Sea Tow land vehicle. It was while they were inside the vehicle that the LOF was presented to the Joneses for their signatures. Mr. and Mrs. Jones contend that Mr. Jones was unable to read the LOF without his glasses and that Mrs. Jones thumbed through the document and was not able to comprehend it; that there was insufficient light in the vehicle to read; that Mrs. Jones returned the form unsigned to Captain Raia, who advised that it merely authorized Sea Tow to tow the vessel back to Freeport; that Captain Raia said that Boat/U.S., the insurer of the vessel, was familiar with the LOF and that there would be no problem if the form were signed; that they understood that they would be left stranded on the beach and would not be helped by Sea Tow if they refused to sign; and that they were unfamiliar with the term "salvage."

Captain Raia denies that he took advantage of Mr. and Mrs. Jones in any way. He asserts that Mrs. Jones read the form before signing her husband's name after he had fully explained the document and that he emphasized that the agreement was for salvage and not towage. He does not recall, however, whether he explained the LOF provision for arbitration. Although it was dark outside, he asserts that there was sufficient light in "Mobile I" for Mrs. Jones to read by. It seems undisputed that the conversation inside the vehicle lasted for 30–45 minutes. Captain Raia acknowledges that, after Mrs. Jones told him that she wished to consult with an attorney, he told her that he "would be unable to render assistance without a signed contract." As to the Boat/U.S. insurance, Captain Raia claims that he explained to Mrs. Jones that "her Boat/U.S. towing insurance would not cover salvage." After the LOF was signed, Captain Raia arranged for a vehicle to drive the Joneses home and later towed the MISS JADE II to Mako Marina, a full-service marina located about 400 yards from the vessel's usual mooring at Yachtman's Cove in Freeport. The vessel was towed a total distance of approximately six miles.

The LOF is a six-page document entitled "Lloyd's Standard Form of Salvage Agreement (Approved and Published by the Council of Lloyd's)." At the head of the form appears a legend in bold type: NO CURE—NO PAY. (This is said to mean that no payment is due unless the salvage is successful). Although the LOF was signed by Mrs. Jones in the Sea Tow land vehicle, the place of signing is filled in as "On board the MISS JADE II." In the first of 19 separate sections, some containing subdivisions within subdivisions, Sea Tow as "Contractor" agrees to use its "best endeavours ... to salve the 'MISS JADE II' and/or her cargo[,] freight[,] bunkers[,] stores and other property." Section 1(c) provides that "[t]he Contractor's remuneration shall be fixed by Arbitration in London," and section 1(g) recites as follows: "This Agreement and Arbitration thereunder shall except as otherwise expressly provided be governed by the law of England, including the English law of salvage."

The remaining sections of the LOF are grouped under the following headings: Provisions As To The Services; Provisions As To Security; Provisions As To Arbitration; Representation; Conduct Of The Arbitration;

Interest; Provisions As To Appeal; Conduct Of The Appeal; Provisions As To Payment; and General Provisions. At the end of the LOF, preceding the signatures of the parties, four articles of the International Convention on Salvage are set forth: *Article 1* (Definition); *Article 8* (Duties of the Salvor and of the Owner and Master); *Article 13* (Criteria for Fixing the Record); and *Article 14* (Special Compensation). Following the signature blocks on the last page of the LOF, there appears a legend printed by hand and subscribed by Captain Raia and by Mrs. Jones in the name of her husband: "I understand that this agreement is a salvage agreement, not a towerage [sic] agreement and that this agreement has been explained to me before I signed it."

It appears that Sea Tow sought to be paid in excess of $15,000 for its "salvage" services, based on a percentage of the value of MISS JADE II. Captain Raia testified in his pretrial deposition that he had a consulting arrangement with a Captain Kaufmann, who receives a fifteen-percent "cut" on salvage payments made to Sea Tow. Among other things, Captain Kaufmann furnishes to the salvors for whom he serves as a consultant a memorandum including what appears to be a sort of "Miranda" warning designed to "explain[ ] the LOF to a casualty while under the pressure of a developing salvage mission." The explanation includes some proposed dialogue to be utilized in attempting to obtain a "casualty" to sign up. The memorandum concludes with the words, "Good Hunting."

Sea Tow instituted an arbitration proceeding against the Joneses in London on November 21, 1991, pursuant to the provisions of the LOF. The arbitration was stayed by stipulation of the parties, and Mr. and Mrs. Jones commenced the action giving rise to this appeal. In the action they claimed that the LOF is unenforceable because Mrs. Jones was in physical and mental distress when she signed it, that she fraudulently was induced to sign and that the contract is based on a mistake. The Joneses also claimed that the Convention does not permit arbitration overseas where the dispute is between United States citizens and United States waters

are involved in the dispute. Sea Tow contended that it was entitled to an order compelling arbitration in accordance with the LOF, and counterclaimed for outstanding salvage costs. The Joneses moved for summary judgment in the district court on both their claims, and Sea Tow cross-moved for leave to file an additional counterclaim for breach of a settlement agreement.

The district court denied the motion for summary judgment to the extent that the relief sought was a declaration that the Convention does not apply to the LOF in this action. The court stayed the action but retained jurisdiction to enforce any award later rendered. The substantive aspect of the summary judgment motion, including the issues of fraud, misrepresentation and mistake as well as Sea Tow's motion to amend the answer were referred to the arbitration proceeding in England. In making the determination, the court first addressed the enforceability of the arbitration provision and applied the rule that, where there is an allegation of fraudulent inducement of an entire contract, an arbitration clause contained in the contract is enforceable and the dispute is arbitrable. In this connection, the district court found that there was "no fraud in the factum in connection with the contract or fraud in the inducement in connection with the arbitration clause," and "consequently h[eld] that enforcement of the arbitration provision in the LOF agreement accords with the parties' expectations and intentions." *Jones v. Sea Tow Servs.*, 828 F.Supp. 1002, 1011 (E.D.N.Y.1993).

Turning to the issue of arbitration in a London forum, the district court found that the Convention, as implemented by Congress, requires arbitration in England under the terms of the LOF. First, the district court found that the parties contemplated enforcement of an award in England:

> In this case, not only does the LOF designate London as the arbitral forum and Lloyd's—an expert in the field of salvage—as the arbitrator, but also it designates English law as the applicable law for settling this dispute. Clearly, these designations indicate that the parties contem-

plated enforcement of this award in Great Britain.

*Id.* at 1016 (footnote omitted). The district court also found that there was a reasonable relation between the LOF and England:

> While it is true that the parties in this dispute are both American citizens, a United States vessel was involved, and Sea Tow appears to function only in United States waters, the LOF establishes a purposeful connection to England by designating the Committee of Lloyd's as arbitrator and by specifying that the British law of salvage governs the dispute.

*Id.* at 1017. We think that the district court erred in finding that the parties contemplated enforcement in England and in finding a reasonable relationship between England and the LOF.

## DISCUSSION

■ The authority of the federal courts to resolve salvage disputes long has been a part of the "admiralty and maritime Jurisdiction" referred to in Article III, section 2 of the United States Constitution. *See Mason v. The Blaireau,* 6 U.S. (2 Cranch) 240, 249, 2 L.Ed. 266 (1804).

> Salvage, simply stated, is the "service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended." To determine that a salvage service (as distinct, for example, from a towing service) was performed, a court must find three specific elements: marine peril; service voluntarily rendered, not required by duty or contract; and success in whole or in part, with the services rendered having contributed to such success.

*B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 338 (2d Cir.1983) (footnote and citations omitted) (quoting *McConnochie v. Kerr,* 9 F. 50, 53 (S.D.N.Y.1881), *modified on other grounds,* 15 F. 545 (C.C.S.D.N.Y.1883)). Although salvage services must be "voluntary," they need not be uncompensated:

> Voluntary service, the *sine qua non* of marine salvage, is rendered in the absence of a legal duty or obligation. Whatever motive impels the true volunteer, be it monetary gain, humanitarian purposes or merely error, it will not detract from the status accorded him by law. Thus professional salvors—who perform their services for monetary gain—may claim salvage awards.

*Id.* at 338–39 (citations omitted).

■ We have adopted the view that awards for salvage services should be based on a number of factors, to be considered

> in descending order of importance as follows: (1) degree of danger from which the property was rescued; (2) value of the property saved; (3) risk incurred in saving the property from the impending peril; (4) promptitude and skill displayed; (5) value of the property employed by the salvors and the danger to which it was exposed; and (6) labor expended in rendering the salvage service.

*Id.* at 339. Generally, salvage awards should not be based upon fixed percentages of the value of the salved property or upon comparisons to percentages from previous awards. *Id.*

The Federal Arbitration Act declares valid and enforceable written provisions for arbitration in any maritime transaction and in any contract evidencing a transaction involving commerce. *See* 9 U.S.C. § 2. The Act defines "maritime transactions" as matters "embraced within admiralty jurisdiction" and "commerce" as including "commerce among the several States or with foreign nations." *Id.* § 1. Ordinarily, agreements to arbitrate salvage disputes fall within these provisions. Where, however, an agreement to arbitrate involves the recognition and enforcement of arbitral awards made in the territory of a nation other than the nation where recognition and enforcement are sought, the Convention applies. Convention, art. I, § 1. Recognition and enforcement then must be pursued in accordance with the terms of the statutory provisions implementing the Convention. *See* 9 U.S.C. §§ 202–208. Chapter I, the original Federal Arbitration Act, applies to actions and proceedings to enforce the Convention to the extent that it is not in conflict with Chapter II, the Convention provisions. *See id.* § 208. It is under these

implementing provisions that Sea Tow invoked the jurisdiction of the district court, *id.* § 203, to secure recognition of the arbitration provisions of the LOF. Despite Sea Tow's argument to the contrary, the district court lacked authority under Chapter I to direct that arbitration proceedings be held outside the Eastern District. *See id.* § 4.

■ The LOF first appeared in the 1890s and since has become the most widely used form of salvage contract in the world. Robert M. Jarvis, Case Note, *SALVAGE ARBITRATION: The arbitration provisions of the LOF are unenforceable in purely domestic salvage cases,* 24 J.Mar.L. & Comm. 573 (1993). Even to those who should be among the cognoscenti, the Lloyd's Salvage Agreement is not a model of clarity. *See, e.g., Black Gold Marine, Inc. v. Jackson Marine Co.,* 759 F.2d 466, 468 (5th Cir.1985) (master of commercial cargo ship apparently unable to discern meaning of LOF even after radioing masters of other ships for advice). It is interesting to note that in the *Black Gold* case, the LOF was held unenforceable because the misrepresentations of the salvor led the master to believe that the contract was intended only to limit the salvor's liability. *Id.* at 470. Whether Mr. and Mrs. Jones were victims of fraud or misrepresentation we leave to another day. We hold here only that arbitration in London under the arbitration provisions of the LOF cannot be compelled in this case, and it is to that proposition that we now turn.

9 U.S.C. § 202, entitled "Agreement or award falling under the Convention" provides as follows:

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless the relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

The LOF provision for arbitration is part of an agreement involving a relationship that is entirely between citizens of the United States—Sea Tow and the Joneses. The relationship between these parties clearly did not involve property located abroad nor did it envisage performance abroad. Whether it envisages enforcement in England or has some other reasonable relation with England, as found by the district court, are the issues that require analysis in this case.

In testimony before the Senate Foreign Relations Committee, the Chairman of the Secretary of State's Advisory Committee on Private International Law, Richard D. Kearney, testified as follows:

We have included in section 202 a requirement that any case concerning an agreement or award solely between U.S. citizens is excluded unless there is some important foreign element involved, such as property located abroad, the performance of a contract in a foreign county (sic), or a similarly reasonable relation with one or more foreign states. The reasonable relationship criterion is taken from the general provisions of the Uniform Commercial Code. Section 1–105(1) of the code permits the parties to a transaction that bears a reasonable relationship to any other state or nation to specify that the law of that state or nation will govern their rights and duties.

S.Rep. 702, 91st Cong., 2d Sess. app. at 6 (1970), *quoted in Fuller Co. v. Compagnie Des Bauxites De Guinee,* 421 F.Supp. 938, 942 (W.D.Pa.1976).

To the same effect is the legislative history in the House of Representatives:

The second sentence of Section 202 is intended to make it clear that an agreement or award arising out of a legal relationship exclusively between citizens of the United States is not enforceable under the Convention in U.S. Courts unless it has a reasonable relation with a foreign state.

H.R.Rep. No. 1181, 91st Cong., 2d Sess. 2 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3601, 3602.

Neither the salvor-casualty relationship, nor the LOF agreement relationship has any *reasonable* relation with England in this case. The purported salvage operation took place just off the coast of the United States, and the LOF was presented to Mrs. Jones for signature in the United States. It is not sufficient that English law was to be applied in the resolution of the salvage dispute and that the arbitration proceeding was to be held before an English arbitrator in England. Indeed, carrying out the analogy of the Uniform Commercial Code referred to in the testimony of Mr. Kearney, the comments to section 1–105 of the Code include the following:

> Ordinarily the law chosen must be that of a jurisdiction where a significant enough portion of the making or performance of the contract is to occur or occurs.

U.C.C. § 1–105 cmt. 1 (1989). It cannot be said that a significant portion of the making or performance of the LOF occurred or is to occur in England, and there is no basis for the application of English law.

■ The reasonable relation requirement necessary to make the arbitration provision in the LOF cognizable under the Convention cannot be fulfilled by the terms of the LOF itself. If it could, the LOF would become a self-generating basis for jurisdiction. In this case, there is no connection with England independent of the LOF. We therefore agree with those courts that have held the arbitration provisions of the LOF insufficient of themselves to confer jurisdiction under the Convention in accordance with section 202. *See Reinholtz v. Retriever Marine Towing & Salvage*, No. CV–92–14141, 1993 WL 414719 (S.D.Fla. May 21, 1993) (after salvage award by arbitrator in London, *held:* LOF insufficient to invoke Convention); *Brier v. Northstar Marine, Inc.*, 1993 A.M.C. 1194, 1992 WL 350292 (D.N.J.1992) (in declaratory action, *held:* provision designating London as place of arbitration insufficient to establish reasonable relation with foreign forum required by § 202).

Although the district court determined that the LOF's designations of London as the arbitral forum, Lloyd's as the arbitrator and English law as governing the arbitration "indicate that the parties contemplated enforcement of this award in Great Britain," *Jones*, 828 F.Supp. at 1016, Sea Tow does not pursue this point on appeal. As a matter of fact, there is no "award" that can be enforced. Moreover, it seems clear that Sea Tow itself contemplated enforcement in New York. When it released the MISS JADE II, Sea Tow obtained a "Letter of Undertaking" from the Jones' insurance underwriter. Since this letter serves to protect Sea Tow's maritime lien and an enforcement of the lien can only take place where the property is located, Sea Tow obviously envisioned enforcement in New York.

The assets of Mr. and Mrs. Jones apparently are in New York. Certainly, there is no indication that they have any assets overseas. It therefore is difficult on the record before us to envision the enforcement of any arbitral award anywhere but in the United States. In the district court, Sea Tow urged recognition of the arbitration provisions of the LOF, and the district court agreed with its position, staying the action giving rise to this appeal and, in effect, directing arbitration to proceed in England. Interestingly enough, the district court "retain[ed] jurisdiction to enforce any award eventually rendered." *Id.* at 1018. Again, there is no important foreign element involved. As between the parties in the case at bar, a United States forum is required for the enforcement of any arbitral award and even to compel arbitration. The district court's observation that the Committee of Lloyd's has a long history of experience in the arbitration of salvage disputes lends no support to the conclusion that the parties envisioned performance in England. There is no indication that competent salvage arbitrators are unavailable in the United States or that the necessary expertise is lacking here.

## CONCLUSION

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with the foregoing.