Charles C. JONES and Clara E. Jones, Plaintiffs,

v.

**SEA TOW SERVICES FREEPORT NEW YORK, INC., Defendant.**

No. CV–91–4669.

United States District Court, E.D. New York.

July 21, 1993.

Frederick A. Lovejoy, Bigham, Englar, Jones & Houston, New York City, for plaintiffs.

Richard P. O'Leary, McCarter & English, New York City, for defendant (Thomas F. Daly, McCarter & English, Newark, NJ, of counsel).

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiffs Charles and Clara Jones, joint owners of the yacht the MISS JADE II, filed the complaint in this declaratory judgment action on November 26, 1991 in response to defendant Sea Tow Services Freeport NY, Inc. ("Sea Tow") having commenced an arbitration proceeding in London, England.[1] Plaintiffs seek a declaration by this court of their rights and responsibilities under a Lloyd's Standard Form of Salvage Agreement ("Lloyd's Open Form" or "LOF") signed by the parties. Defendant counterclaims for outstanding salvage fees owed under the LOF. The parties agreed to stay the London arbitration pending resolution of this action.

Several motions are currently before this court. First, plaintiffs move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure arguing that no material issue of fact exists concerning either this court's power to compel foreign arbitration or the validity of the contract. Second, defendant cross-moves for leave to file a second amended answer stating an additional counterclaim against plaintiffs for breach of a settlement agreement between the parties. In response to the motion to amend, plaintiffs move for Rule 11 sanctions against defendant based on the assertion that the parties never actually entered into a finalized settlement agreement and that even if they did, defendant could have included this counterclaim through its first motion to amend. For the reasons provided below, this court

finds that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards governs the LOF at issue; accordingly, this action is hereby stayed pending arbitration in London in accordance with the provisions of the contract between the parties.

## FACTS

The MISS JADE II is a 33' pleasure craft registered and moored in New York State. At approximately 8:30 p.m. on the evening of August 20, 1991—during a voyage from Essex, Connecticut to the yacht's home port of Freeport, New York—the MISS JADE II was struck by a wave. The boat rolled over, causing the Joneses to sustain some minor injuries. (Deposition of Charles C. Jones, dated July 14, 1992, at 41, 43, 116–17) [hereinafter CCJ Dep. at ——]. The vessel eventually came to rest on Atlantic Beach, Long Island, where a passerby assisted the plaintiffs in tying a line to one of the vessel's cleats to prevent her from drifting. Thereafter, the police were contacted, and an Officer Daly arrived to lend assistance.

Mr. Jones radioed for help from the United States Coast Guard who, in turn, requested that defendant Sea Tow, a professional salvage company, render aid to the stranded vessel. Captain Robert Raia, accompanied by Michael Marsh, arrived at Atlantic Beach in the Mobile I, a Sea Tow land vehicle. Marsh set the vessel's anchor as an additional measure to prevent the MISS JADE II from drifting (CCJ Dep. at 35), at which point Officer Daly left the scene and plaintiffs entered Captain Raia's vehicle. (CCJ Dep. at 143).

Once inside the Sea Tow Mobile I, plaintiffs were handed the Lloyd's Open Form agreement by Captain Raia. Appearing on the front page and throughout the LOF are statements that any disputes under the agreement are subject to arbitration in London, England.[2] The document also expressly states that the law of England, "including the

---

1. Jurisdiction rests on the admiralty jurisdiction statute, 28 U.S.C. § 1333, and the parties have invoked the maritime procedures specified in Rule 9(h).

2. For example, Provision 1(c) of the LOF states:

The Contractor's remuneration shall be fixed by Arbitration in London in the manner hereinafter prescribed and any other difference arising out of this Agreement or the operations thereunder shall be referred to Arbitration in the same way. .

English law of salvage," governs any proceedings. Furthermore, in large block letters on the front of the LOF appear the words "No Cure, No Pay," meaning that the salvor receives nothing for its risk and efforts if the salvage operation is unsuccessful. If the salvage operation is completed successfully, however, the salvor submits a claim for remuneration based on a number of factors including the vessel's value, the skill and effort necessitated by the salvage operation, and the level of success of that operation. *See* LOF Article 13; *Trico Marine Operators, Inc. v. Dow Chemical Co.*, 809 F.Supp. 440, 441–43 (E.D.La.1992) (discussing criteria for salvage awards). Should the owner or insurer contest this claim, the disagreement is submitted to arbitration before the Lloyd's of London Arbitration Panel and either party to the agreement who wishes to be heard nominates a representative to proceed in the United Kingdom. Defendant contends that Lloyd's is an expert in the field of salvage awards.

The parties dispute the events that followed Captain Raia handing the LOF to Charles and Clara Jones. Plaintiffs claim that Captain Raia took advantage of their situation by misleading or failing to inform them about the nature of the contract they were signing and by requiring them to sign that contract under difficult and stressful conditions. More specifically, plaintiffs allege that poor lighting, loss of Mr. Jones's glasses, and a head injury sustained by Mrs. Jones prevented them from reading and understanding the LOF agreement. (Plaintiffs' 3(g) Statement ¶¶ 9–10; CCJ Dep. at 52, 66, 105, 112–13, 116–17, 119–20, 137–38; Deposition of Clara E. Jones, dated July 8, 1992, at 28, 34–36) [hereinafter CEJ Dep. at ——].[3] Plaintiffs also assert that Captain Raia induced them to sign the agreement by assuring them that Boat/U.S., their insurer, was familiar with LOFs, (CCJ Dep. at 52; CEJ Dep. at 38–39, 136–37), and by intimating that they would receive no help from Sea

Tow if they refused to sign. (CCJ Dep. at 107–08; CEJ Dep. at 30–31, 107, 110). Plaintiffs also point out that Captain Raia did not give them a copy of the agreement to take home with them on the evening of the storm.

Plaintiffs do concede that Captain Raia spent between 30 and 45 minutes explaining something about the agreement to them, although they either disagree or cannot recall the specifics of that conversation. The following deposition testimony concerning the discussions inside the Mobile I is representative. First, Mr. Jones testified as follows:

Q: Looking at the document that has been marked D 1 for identification with today's date which is the Lloyd's salvage agreement, did your wife at that time that was signed in your name tell Capt. Raia that she objected to signing it?

\* \* \* \* \* \*

A: She signed under protest. You needed a lawyer to read these forms to see what it was all about, but at this point, he couldn't do anything unless we signed. That's where the signature comes in.

Q: Did your wife say to Capt. Raia "I am signing this under 'protest' "?

A: Something to that effect. You couldn't read it, the lighting was poor.

Q: Precisely what do you recall your wife saying?

A: I don't recall exact words. We were trying to get something going. He kept trying to explain something about some law, but we didn't understand what he was talking about. At this point, we were upset, wet, cold and the only thing that I understood is that he couldn't do anything unless we signed something.

Q: How long did he try and explain it to you?

A: How long did it take him? I don't know.

Q: Your best estimate?

**3.** While deposition testimony indicates that plaintiffs *were* concerned about their boat and their safety on that evening, (CCJ Dep. at 50–51, 69–70, 107–08, 125–29, 135–36; CEJ Dep. at 30–31, 107, 110), some portions of the depositions also indicate a level of rationality inconsistent with

voiding contracts. (CCJ Dep. at 118; CEJ Dep. at 28–29). For example, Mrs. Jones testified that she signed her husband's rather than her own name to protect them from liability if the contract turned out to be unfavorable to them.

A: I don't recall. 45, 40 minutes, a half hour, I don't recall.

Q: Did your wife ever say to Capt. Raia "I don't want to sign this"?

A: Yes. Neither one of us wanted to sign, we don't sign anything without reading it but at that point we were just like over a barrel, we had to sign something otherwise there was a possibility of losing the boat drifting out to sea, something had to be done immediately.

Q: At the time the agreement was signed, Capt. Raia's assistant had already put the anchor out, hadn't he?

Mr. Lovejoy: Objection.

A: I don't recall whether it was done after or before.

(CCJ Dep. at 93–94). And Mrs. Jones testified:

Q: Now, you've testified, I believe, that you were in the four by four for about 40 to 45 minutes before the agreement was signed; is that correct?

A: It seemed to be that much. It seemed to be. I wasn't looking at a watch.

Q: During that period of time, did Captain Raia make an effort to explain the agreement to you?

A: Captain Raia said he deals with Boat/ U.S. all the time, they were familiar with the forms and we wouldn't have a problem. It is a reputable company, right down the road—"right down the canal from you"; this was 1, 2, 3, according to him.

He would not read that entire form for us. He did not explain that form to us properly. It was misleading what he said. And I will stand by that.

Q: Did he say anything else other than what you just said?

A: Yes. He says, "Don't worry about it. We're familiar with them, O.K. They deal with us all the time. They are familiar with the form."

I'm not familiar with the form. They are familiar with the form.

Q: Did he saying [sic] anything else?

A: Basically that's the way it went for a while, till he finally convinced us, you know, and he said he would not—could not

help us unless the form was signed, which I'm sure you will see.

(CEJ Dep. 136–37).

In stark contrast to plaintiffs' version of the above event, defendant asserts that Mrs. Jones actually read the LOF, that there was ample light to read the document, and that Mr. Jones had ample time to read it. (Defendant's 3(g) Statement ¶¶ 4, 12; Affidavit of Captain Robert Raia, dated September 16, 1992, at ¶¶ 5–6). In addition, defendant claims that Captain Raia read to plaintiffs portions of something called the Miranda Act for Salvors, (Deposition of Captain Robert Raia, dated July 8, 1992, at 76–77), and informed plaintiffs, prior to their signing, that the LOF was a *salvage* and not a towage agreement. (Raia Aff. ¶ 11 & Exhs. B–D). The following hand-written statement on the LOF corroborates this assertion:

I understand that this agreement is a salvage agreement, not a towerage agreement and that this agreement has been explained to me before I signed it.

Sea Tow does not claim that Mrs. Jones wrote this statement; rather, the words were xeroxed onto the page prior to her signing. Nevertheless, the statement appears in large, off-set writing and Mrs. Jones inscribed her husband's name immediately above and below the quoted language. Finally, Captain Raia admits not specifically discussing the London arbitration or choice-of-law provisions with plaintiffs. (Raia Dep. at 118–20).

The vessel was hauled to Mako Marina during the next high tide, which occurred at 8:30 a.m. on the morning following the wreck. Mako Marina is located in the same inlet as Yachtsman's Cove, some 400 yards away. The MISS JADE II remained at Mako for 27 days under circumstances which also are disputed by the parties. Plaintiffs contend that Sea Tow needlessly blocked the vessel at the nearby marina resulting in the Joneses being billed for additional unnecessary storage sums. (Plaintiffs' 3(g) Statement ¶¶ 21–23). Defendant argues that the delay was a consequence of a billing dispute between Mako Marina and plaintiffs' insurer and delays by plaintiffs' insurer in arranging for a survey of the vessel. (Defendant's 3(g) Statement ¶ 9–11).

Pursuant to provisions of the LOF, Sea Tow commenced a foreign arbitration proceeding against the Joneses in London, England on or about November 21, 1991. As mentioned above, that arbitration was stayed by agreement of the parties at approximately the same time that plaintiffs commenced this action. The depositions of Clara Jones, Charles Jones, and Captain Raia, all the principals in this action, have been taken.

In their complaint, plaintiffs contend that the LOF is a contract of adhesion, that it was signed by one of the plaintiffs while under mental and physical distress, that she was fraudulently induced into the signing, and that she entered into the contract because of mistake; based on these circumstances, plaintiffs urge this court to declare the LOF unenforceable. Plaintiffs also argue that this court may not compel foreign arbitration or confirm any resulting arbitration award because the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 *et seq.*, prohibits the arbitration of disputes overseas when both of the parties are American citizens and the event occurred in United States waters. By way of relief, plaintiffs seek a stay of the arbitration proceedings already commenced in London and an off-set in any towage fee award to Sea Tow to account for the costs incurred in storing the vessel. In its answer, defendant argues that the arbitration provision in the LOF deprives this court of jurisdiction over the dispute and entitles Sea Tow to an Order compelling arbitration in accordance with the contract. Defendant also counterclaims for outstanding salvage costs and cross-moves to amend its answer to state a second counterclaim for breach of a settlement agreement between the parties.

## DISCUSSION

As alluded to above, plaintiffs rest their motion for summary judgment primarily on two arguments. First, they argue that a court cannot enforce an agreement to arbitrate if the disputed agreement is "null and void, inoperative or incapable of being performed," 9 U.S.C. §§ 2, 202; more specifically, plaintiffs in this case claim that their agreement is invalid based on mistake, mis-

representation, duress, and the fact that the LOF is a contract of adhesion. Second, plaintiffs assert that the LOF fails to satisfy the provisions of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which they argue is the sole authority for a United States court to order arbitration in a foreign forum. Since the only connection between the parties' dispute and the arbitral forum is the agreement to arbitrate there, plaintiffs contend, this court should stay the London arbitration, declare the contract invalid, and decide the monies owed for the services performed by Sea Tow in August of 1991.

### I. *Enforceability of Arbitration Agreement*

 The first issue to be resolved in this case is whether the parties' agreement to arbitrate is enforceable. "[R]eversing centuries of judicial hostility to arbitration agreements, [Sections 1 through 9 of Title 9 of the United States Code, known as the Federal Arbitration Act (the "Act" or the "FAA") ] was designed to allow parties to avoid 'the costliness and delays of litigation,' and to place arbitration agreements 'upon the same footing as other contracts.'" *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 511–12, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974) (*quoting* H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)). Section 2 of the Act provides in pertinent part:

> A written provision *in any maritime transaction* or contract evidencing a transaction in commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an exiting controversy arising out of such a contract, transaction or refusal, *shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.*

9 U.S.C. § 2 (emphasis added). Section 3 of the Act requires a court to stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement. 9 U.S.C.

§ 3;[4] *Scherk,* 417 U.S. at 511, 94 S.Ct. at 2453. And section 4 provides in relevant part as follows:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28 ... for an order directing that such arbitration proceed in the manner provided for in such agreement.... *The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration ... is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.* The hearing and proceeding shall be within the district in which the petition for an order directing such arbitration is filed.

9 U.S.C. § 4 (emphasis added). The question now presented is whether the "making of the agreement for arbitration" in this case is in issue.

The seminal Supreme Court case discussing this topic is *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). The plaintiff in *Prima Paint* argued that it should not be bound by an arbitration clause in a contract signed by the parties because it had signed the contract as a direct result of defendant's false promises. *Id.* at 398–99, 87 S.Ct. at 1803–1804. The Supreme Court rejected this argument, stating that

> if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agree-

ment to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403–04, 87 S.Ct. at 1806 (footnote omitted). In effect, the Court reasoned that the arbitration clause constituted a severable agreement apart from the contract in which it was contained. *See Schacht v. Beacon Ins. Co.,* 742 F.2d 386, 389 (7th Cir.1984) ("[O]nly when the claimed contractual invalidity goes to the arbitration clause itself does the court determine the existence of a contractual provision: 'Where the claim of invalidity goes to the entire contract containing the agreement to arbitrate, ... [t]he issue is for an arbitrator to decide.'") (*quoting Matterhorn, Inc. v. NCR Corp.,* 727 F.2d 629, 630 n. 3 (7th Cir.1984)).

In raising a claim of fraudulent inducement of contract, a party must argue that its knowing assent to the terms of the contract followed from a false promise by the other side; thus, unless the specific arbitration provision *itself* was obtained via a false promise, the signatory has fairly agreed to submit disputes to arbitration. Where "fraud in the factum" is alleged, however, the *Prima Paint* notion of the severability of the arbitration clause has no application.[5] If no agreement ever existed, it makes no sense to apply *Prima Paint's* requirement of a specific attack on the making of the arbitration clause itself. The Eleventh Circuit explained this theory concisely in *Cancanon v. Smith Barney, Harris, Upham & Co.,* 805 F.2d 998 (11th Cir.1986) (per curiam), a case in which the plaintiffs alleged that the defendant took

---

4. That Section provides in full as follows:

 *If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration* under an agreement in writing for such arbitration, *the court* in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall* on application of one of the parties *stay the trial of the action until such arbitration has been had* in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

 (Emphasis added).

5. The difference between fraud in the inducement and fraud in the factum was explained by Farnsworth as follows:

 A distinction is drawn between misrepresentation that goes only to the "inducement" and misrepresentation that goes to the "factum" or the "execution".... In rare cases ... the misrepresentation is regarded as going to the very character of the proposed contract itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect. Such a misrepresentation is said to go to the "factum" or the "execution."

 E. Farnsworth, Contracts § 4.10 (2d ed. 1990).

advantage of their inability to read English and persuaded them to sign securities account agreements by misrepresenting the character of those documents:

> Where misrepresentation of the character or essential terms of a proposed contract occurs, assent to the contract is impossible. In such a case there is no contract at all. Restatement (Second) of Contracts § 163, comment a (1977). In *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51, 54–55 (3d Cir.1980), the court stated "[t]he mere execution of a document ... does not negate a factual assertion that such signature was not intended to represent a contractual undertaking."

*Id.* at 1000; *see also Chastain v. Robinson–Humphrey Co.,* 957 F.2d 851, 855 (11th Cir. 1992); *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 462 F.2d 673, 676 (2d Cir.1972) (reversing district court's dismissal of action pursuant to arbitration clause since plaintiffs contested ever assenting to material provisions in charter agreement thereby calling into question existence of contract), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Pollux Marine Agencies v. Louis Dreyfus Corp.,* 455 F.Supp. 211, 218 (S.D.N.Y.1978) ("The issue in *Prima Paint* ..., fraud in the inducement, differs from the issue in dispute here in that fraud in the inducement affects only the validity, legality or enforceability of a contract; *it does not negate the existence of a contract and thereby raise a question as to the existence, validity, legality or enforceability of the arbitration clause therein.*") (emphasis added); *cf. C.B.S. Employees Fed. Credit Union v. Donaldson, Lufkin & Jenrette Secur. Corp.,* 912 F.2d 1563, 1566–68 (6th Cir. 1990) (apparently rejecting factum/inducement distinction in *Prima Paint* context but refusing to compel arbitration because "where a plaintiff's pleading attacks the contract in general, as well as the arbitration clause contained therein, the allegation of fraud as to the arbitration clause should be decided by the district court.").[6]

What the above-cited cases have in common is that they all posed the preliminary question of whether or not a contract existed at all. That is not the issue in this case. As an initial matter, although plaintiffs assert that Captain Raia did not specifically mention the arbitration provision to them, they do not claim that that provision itself was fraudulently procured apart from the remainder of the contract. With respect to the entire LOF, plaintiffs contend that it is voidable because it was procured by Sea Tow as a result of Captain Raia's fraud and the Joneses' duress. Irrespective of these allegations, all of which go to the issue of whether and to what extent the LOF is enforceable, it is clear that an agreement of some form exists between the parties. Testimony reveals that plaintiffs understood, when they signed the LOF, that it constituted a means by which Captain Raia on behalf of Sea Tow would move the MISS JADE II to a marina in return for compensation:

Q: How did you think [Captain Raia] was going to get paid?

A: Through our insurance company.

Q: So you knew—

A: I'm looking for tow job whatever he have to do to get it out take it to a marina and then we—whoever had the boat, repair it.

Q: Did he say he was going to charge you for a tow?

A: He didn't tell me anything. I assume that's a towing company.

Q: Did he discuss with you the concept of signing an agreement?

 \* \* \* \* \* \*

A: [Y]es, he said he couldn't touch the boat unless I signed some sort of agreement?

Q: Did that seem reasonable to you?

 \* \* \* \* \* \*

A: I had no choice. Either that or leave the boat there.

---

**6.** A party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of that claim in order to precipitate the trial contemplated by 9 U.S.C. § 4. *Manning v. Energy Conversion Devices, Inc.,* 833 F.2d 1096, 1103 (2d Cir. 1987).

Q: Did you think it was necessary to get the boat off that night or could you have left it until the next day.

A: I don't know.

(CCJ Dep. at 50–51, 69–70). And Mrs. Jones testified:

Q: Did you have an understanding at the time you signed the agreement that the agreement provided a method for Sea Tow to get paid for their services?

\* \* \* \* \* \*

A: I understood the agreement was providing payment. What method they used, I had no knowledge of. Okay? How they calculate the payments, I have no knowledge of. I know that it allowed the insurance company—I assumed it allowed the insurance company to pay them for their services to us. Towing services to us. At that time it did not mention anything other to me, he did not mention anything other to me.

Q: Did you understand at the time you signed the agreement that somewhere within the four corners of that agreement, there was a proviso, provision for a manner in which Sea Tow would get paid?

\* \* \* \* \* \*

A: I knew that they were going to get paid. What method or how they calculate their payments was no concern of mine.

Q: And you understood that this document that would be marked D1 for identification where you signed your husband's name provided something about how they were going to get paid, you understood that, didn't you?

\* \* \* \* \* \*

A: I understood that this was going to allow payment. How they calculate it, what method they're going to use, is not my concern.

(CEJ Dep. at 43–46). Moreover, Mrs. Jones's explanation of why she signed her husband's name to the LOF confirms that plaintiffs knew they were entering into an agreement at that time, although they believed that the signature could eventually render the LOF voidable:

Q: Why did you sign his name.

A: [B]ecause I did not know—I felt good about [Captain Raia] being there but when he put the pages and he said to us that he could not help us unless we signed first, it scared me. It really made me leery and I am in a four by four, the light is over him in the front, we're in the back and he gives this to my husband and my husband says listen I don't have my glasses, I can't see this. He gives it back and I said let me see it and I reach for it, okay and I still don't know what it was all about and he says you asked me a question, please let me answer it. He said to me well, Boat/US is familiar with this. We work for them all the time, you see us all over the place. I said yes, I do. I took them at good faith and I took him for his word however, he insists that we sign this before he do anything so I said I can't do anything for you.

At this time, the police is gone, nobody is there but him and us in the middle of nowhere. Yes, I signed it. And I told him I was going to sign my husband's name I said because I don't know how good this will be for you.

Q: Did you tell him that you signed your husband's name all the time?

A: No, I didn't. I didn't tell him I signed his name all the time, I told him I was going to sign his name to this paper. I could have signed my own name. I'm part owner.

Q: Did you tell him you were signing your husband's name to the paper because you thought that way the agreement would be unenforceable?

A: I said if it was something that was not supposed to be signed it would be something that would be looked at.

Q: So was your thought in your own mind was the thought that it wouldn't be enforceable?

A: Sure it was something I wasn't supposed to sign.

(CCJ Dep. at 118; *see also* CEJ Dep. at 28–29). In sum, this action falls under the rule of *Prima Paint*: where parties allege fraudulent inducement of the contract as a whole, the arbitration agreement is enforceable and

the dispute is arbitrable. *See, e.g., Bhatia v. Johnston,* 818 F.2d 418, 421–22 (5th Cir.1987) (finding that plaintiff's claim of fraud related to entire agreement and not just arbitration clause when plaintiff, who did not read agreement, alleged that agreement was not explained to him, that he had no bargaining power, that it was a contract of adhesion, and that he relied on misrepresentations made to him).

Plaintiffs' reliance upon *Black Gold Marine, Inc. v. Jackson Marine Co.,* 759 F.2d 466 (5th Cir.1985), does not undermine this conclusion since *Black Gold,* like the cases cited above, involved the question of whether a valid contract was formed in the first place. Faced with a declaratory judgment action seeking a determination of the validity of an LOF between a boat owner and a salvor, the *Black Gold* court proceeded directly to a bench trial on the issue of contract validity. *Id.* at 469–70. The district court found credible the Captain's testimony that the salvor had led him to believe that the LOF was solely "designed to limit [the salvor's] liability for any damage to the [boat] that resulted from the tow," *id.* at 468, and therefore held that the contract was void. The Fifth Circuit affirmed, determining that the lower court's findings of fact were not clearly erroneous. *Id.* at 470. In so doing, the appellate court explained in a footnote as follows:

> In a lingering challenge to the fraudulent procurement issue, [the salvor] argues that the district court was not authorized to find fraud where [the Captain] admitted that he did not read all of the provisions of the contract. [This] argument places the cart before the horse. While it is true that ordinarily a party who intentionally signs a document is bound by its contents, regardless of whether he read the document, *see Donovan v. Mercer,* 747 F.2d 304, 408 n. 4 (5th Cir.1984); *Quality Foods, Inc. v. U.S. Fire Ins. Co.,* 715 F.2d 539, 542 (11th Cir.1983), if the party who did not read the document was induced to sign the document through the defendant's fraud or misrepresentation, that party may nevertheless rescind the contract. *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir.1980). *Notwithstanding [the Captain's] apparently meritorious contention that he diligently attempted to ascertain the meaning of the document, therefore, [the salvor's] fraudulent activities eliminated [the Captain's] need to carefully read the entire document.*

*Id.* at 470 n. 1 (emphasis added). As detailed above, the facts of the case before this court differ materially from the facts in *Black Gold:* there is no question that the Joneses understood that they were forming a contract by which their insurer would compensate Sea Tow. Therefore, this case—in contrast to *Black Gold*—is subject to the rule of *Prima Paint.*[7]

7. While plaintiffs also claim that they understood the LOF to be a contract for towage and not a contract for salvage, (CCJ Dep. at 59–60; CEJ Dep. at 47–51), this belief does not change the conclusion that the issues posed by this complaint are arbitrable. Either type of contract could contain an arbitration clause, readily discoverable upon reading. Furthermore, as already mentioned, plaintiffs were aware that the agreement they signed elicited the help of Captain Raia and Sea Tow in taking care of their boat. Finally, this court finds that no reasonable trier of fact could conclude that Mrs. Jones failed to notice the handwritten paragraph that appeared immediately above and below where she signed her husband's name.

If this court were to reach the questions of duress, fraud, and mistake, it nevertheless would have no difficulty holding—on the basis of the sworn deposition testimony—that there are no questions of fact with respect to these issues: plaintiffs clearly knew what they were doing when they signed the contract, as is demonstrated by Mr. Jones's dominant concern for getting his boat home safely and Mrs. Jones's decision to sign her husband's name; Captain Raia did not threaten to abandon them on the beach but rather required a signature before he could salvage the boat. Finally, with respect to the question of whether this contract is one of adhesion, this court agrees with observations made by Magistrate Judge Rosen in *Brier v. Northstar Marine, Inc.,* CV–91–597, 1992 WL 350292 (D.N.J. April 23, 1992), a case discussed further in text. Faced with similar facts, the magistrate found as follows:

> Plaintiff additionally asserts that the LOF Agreement is a contract of adhesion which plaintiff was forced to sign under duress. I have combed the record and there is no evidence to support a finding that plaintiff was compelled to sign the agreement. While it may be true that plaintiff was anxious to have his vessel freed from the sandbar, this alone is insufficient to hold that the agreement was one of adhesion.

Slip op. at 8. Similarly, although the Joneses were eager to have the MISS JADE II towed, the

In sum, because this court finds no fraud in the factum in connection with the contract or fraud in the inducement in connection with the arbitration clause, it consequently holds that enforcement of the arbitration provision in the LOF agreement accords with the parties' expectations and intentions. It also is consistent with recent Second Circuit authority demonstrating the continued vitality of the federal policy favoring arbitration. *See, e.g., Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional de Venezuela,* 991 F.2d 42, 48 (2d Cir.1993) (reversing district court's refusal to stay arbitration). What remains to be determined, however, is whether the parties' choice of forum and procedure for this arbitration is enforceable. To that question, this court now turns.

## II. *Arbitration in a London Forum*

### A. *The Convention*

Sections 201 through 208 of Title 9 comprise the enabling legislation in this country for the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, New York, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. 6997, 330 U.N.T.S. 38 (1970) (the "Convention"). Section 202 defines the scope of the Convention:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. *An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.* For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

9 U.S.C. § 202 (emphasis added). Section 206 grants a district court authority to compel arbitration in accordance with the agreement between the parties as follows:

> A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.

9 U.S.C. § 206. And Section 207 requires a United States court to confirm a foreign arbitral award if either party applies for confirmation within three years and if the court does not find Section 202 to bar recognition. 9 U.S.C. § 207.

In *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat. Oil Co. (Pemex),* 767 F.2d 1140 (5th Cir.1985), the Fifth Circuit described the interplay between the Federal Arbitration Act—Chapter One of Title 9 which is discussed above—and the Convention—Chapter Two of that Title as follows:

> Both the Arbitration Act and the Convention provide that if a dispute in a pending lawsuit is subject to arbitration, the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had." Both provide that the district court "shall make an order directing the parties to proceed to arbitration" when the site for arbitration is within the district. But § 206 of the enabling legislation for the Convention also authorizes district courts to order parties to proceed with a Convention arbitration even outside the United States.

*Id.* at 1146 (footnotes omitted). The *Sedco* court also discussed the federal policy in favor of arbitration:

> The Supreme Court leaves no doubt that: "The goal of the convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements and inter-

Sea Tow representatives had secured the vessel prior to the LOF negotiations. The fact that plaintiffs' insurer Boat/U.S. may not appreciate that its assureds enter into such contracts does not make the LOF a contract of adhesion; the proper course for dealing with objections to this type of contract is to warn boat owners about the LOF, as Boat/U.S. has begun to do.

national contracts and to unify the standard by which the agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries."

*Id.* at 1147 (*quoting Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 2457 n. 15, 41 L.Ed.2d 270 (1974)); *see generally Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 630, 105 S.Ct. 3346, 3355–3356, 87 L.Ed.2d 444 (1985) (strong federal policy favoring arbitration takes on even more importance in multinational commerce); *Progressive Casualty,* 991 F.2d 42 (construing Lloyd's of London arbitration clause broadly in light of strong federal policy favoring arbitration); *Meadows Indemnity Co. v. Baccala & Shoop Insurance Services, Inc.,* 760 F.Supp. 1036, 1040–45 (E.D.N.Y.1991) (discussing subject matter capable of settlement by arbitration under Convention in light of strong arbitration policy).

### B. *Compelling Foreign Arbitration*

Plaintiffs in this action assert that this court lacks power to compel arbitration in London under Section 206 because the agreement at issue does not meet the requirements of Section 202. Specifically, they argue that an agreement to arbitrate abroad does not fall within the Convention when that agreement is solely between United States citizens unless there is a reasonable relationship with the designated foreign state. For support, they quote at length from and rely primarily on *Brier v. Northstar Marine, Inc.,* CV–91–597, 1992 WL 350292 (D.N.J. April 23, 1992), the first case to consider the precise question at issue.[8]

Citing the legislative history of the Convention and its enabling legislation, defendant responds by arguing that Congress intended the statute to encourage submissions of international commercial disputes to arbitral bodies and to ensure that any foreign arbitral awards would be enforceable in United States courts. *See Andros Compania Maritima, S.A. v. Andre & C.I.E., S.A.,* 430 F.Supp. 88 (1977) (finding consistent "the

Convention's design—*i.e.,* to encourage submissions of international commercial disputes to arbitral proceedings" and "the longstanding federal policy favoring resort to arbitration of disputes, whether or not entirely domestic"). Therefore, defendants assert, enforcing this arbitration provision—which specifies London as· the arbitral forum and therefore has some connection to a foreign state—is consistent with the goals of the Convention and the FAA as well as with the parties' intentions.

The parties ·also express vastly divergent views of the policy considerations implicated by this contract. Plaintiffs argue that the LOF allows salvors to receive higher salvage awards and to coerce plaintiffs into settlement because of a reluctance to arbitrate abroad. Defendant, in contrast, argues that the Committee of Lloyd's is the only internationally recognized body dealing with marine salvage arbitrations and that Lloyd's "and salvage arbitration are virtually synonymous in the maritime world of maritime law." Defendant emphasizes that since no salvage fee is set prior to performing such contracts, uniformity is essential. Bearing these arguments in mind, this court turns to the question of whether the LOF at issue fulfills the requirements of Section 202.

As an initial matter, it is not clear that the distinction between the two sections that authorize orders to compel arbitration—9 U.S.C. §§ 4 and 206—is relevant to this case. Plaintiffs primarily seek a declaration that the LOF is void, and defendant, in response, requests that this court stay the action and allow the arbitration to proceed. Thus, there is no request to "compel" arbitration in London, the remedy to which Sections 4 and 206 are directed. Furthermore, it is entirely unclear that courts which have interpreted Section 4 to restrict the location of the arbitral forum to the physical boundaries of the district in which the court sits have correctly analyzed the language of the statute. *See, e.g., Econo–Car Int'l v. Antilles Car Rentals, Inc.,* 499 F.2d 1391, 1394 (3d Cir.1974) (finding Section 4's directive that arbitration be

---

**8.** Plaintiffs recently brought to this court's attention a second case, *Reinholtz v. Retriever Marine Towing & Salvage,* No. 92–14141 (S.D.Fla. May 21, 1993), discussed below, which adheres to the *Brier* rationale.

conducted according to terms of agreement "implicit at best" and thus heeding "unambiguous statutory language limiting the district court's power to order arbitration outside of the district."). The two clauses of Section 4 are easily reconciled by a close reading of the statutory language: the court in the district in which the petition was filed must "hear" the parties concerning whether the "making of the agreement for arbitration" is at issue; once *that* "hearing" or "proceeding" takes place, the court must order arbitration "in accordance with the agreement." 9 U.S.C. § 4; *cf. Snyder v. Smith*, 736 F.2d 409, 418–20 & n. 7 (7th Cir.) (describing dilemma and holding that absent "compelling or countervailing" reason, district court must order arbitration as provided in contract even if forum is outside of district), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984).

Accepting that an agreement to arbitrate exists, the question presented to this court is not whether it should compel arbitration but rather whether it should adhere to the LOF and stay this action pending arbitration in London. As no court in this circuit has addressed this precise question, two considerations are relevant: the law governing forum-selection clauses; and the applicability of the Convention, which empowers this court to confirm any resulting arbitral award.

### C. *Forum–Selection Clauses*

In *Scherk v. Alberto–Culver*, 417 U.S. at 518–19, 94 S.Ct. at 2456–57 the Supreme Court compared arbitration clauses to forum-selection clauses as follows:

> Two Terms ago in *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1 [92 S.Ct. 1907, 32 L.Ed.2d 513] we rejected the doctrine that a forum-selection clause of a contract, although voluntarily adopted by the parties, will not be respected in a suit brought in the United States " 'unless the selected state would provide a more convenient forum than the state in which suit is brought.' " *Id.* at 7 [92 S.Ct. at 1912]. Rather, we concluded that a "forum clause should control absent a strong showing that it should be set aside." *Id.* at 15 [92 S.Ct. at 1916]. We noted that "much uncertainty and possibly great inconvenience

to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur or if jurisdiction were left to any place [where personal or *in rem* jurisdiction might be established]. The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting." *Id.* at 13–14 [92 S.Ct. at 1915].

> An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute. The invalidation of such an agreement in the case before us would not only allow the respondent to repudiate its solemn promise but would, as well, reflect a "parochial concept that all disputes must be resolved under our laws and in our courts.... We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts." *Id.* at 9, 92 S.Ct. at 1913.

(Emphasis added) (footnotes omitted). As this language instructs, courts are to give substantial deference to the parties' choice of location and manner in which they agree to resolve their disputes. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, ——– ——, 111 S.Ct. 1522, 1526–28, 113 L.Ed.2d 622 (1991) (refusing to adopt lower court's determination "that a non-negotiated forum-selection clause in a form ticket contract is not enforceable simply because it is not the subject of bargaining."); *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1363 n. 2 (2d Cir.1993) (discussing presumptive validity of forum-selection and arbitration clauses and explaining that "contracts entered into freely generally should be enforced because the financial effect of forum selection and choice of law clauses likely will be reflected in the value of the contract as a whole."); *Chasser v. Achille Lauro Lines*, 844 F.2d 50, 54 (2d Cir.1988) (forum-selection clause "grants an important right that should be recognized unless the party resisting enforcement shows the clause to be unreasonable."); *Avis Rent A Car System Inc. v. Garage Employees*

*Union, Local 272,* 791 F.2d 22, 26 (2d Cir. 1986) (reversing district court's refusal to enforce contract requiring arbitrators to be selected in certain way from among specific group because "analogous contractual forum selection clauses are ordinarily binding and enforceable unless the party resisting them shows them to be unreasonable").

While espousing this deferential policy, Supreme Court cases discussing forum-selection clauses also have made clear that when faced with "an agreement between two Americans to resolve their *essentially local* disputes in a remote alien forum ... the serious inconvenience of the contractual forum to one or both of the parties might carry greater weight in determining the reasonableness of the forum clause." *The Bremen,* 407 U.S. at 17, 92 S.Ct. at 1917 (emphasis added); [9] *see also Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 957

(10th Cir.) (discussing forum-selection and choice-of-law clauses and explaining that "[w]hen an agreement is truly international, as here, and reflects numerous contacts with the foreign forum, the Supreme Court has quite clearly held that the parties' choice of law and forum-selection provisions will be given effect."), *cert. denied,* — U.S. —, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992). For the purposes of this case, Section 202 of Title 9 defines when a dispute is wholly domestic or instead is sufficiently connected to a foreign forum to justify enforcing a foreign arbitration clause. *See Bergesen v. Joseph Muller Corp.,* 710 F.2d 928, 933 (2d Cir.1983) ("Inasmuch as it was apparently left to each state to define which awards were to be considered nondomestic, ... Congress spelled out its definition of that concept in section 202.").[10] Therefore, bearing in mind

---

**9.** While *The Bremen* held that a forum-selection clause "should control absent a strong showing that it should be set aside," 407 U.S. at 15, 92 S.Ct. at 1916, the Court also discussed three circumstances where such clauses should not be enforced. First, a court should refuse to enforce a forum selection clause if the party opposing enforcement proves that a foreign trial "will be so manifestly and gravely inconvenient" that it will "effectively deprive" him of a meaningful day in court. *Id.* at 19, 92 S.Ct. 1918. The Joneses have not satisfied this burden: the contract itself provides for appointment of a representative in London; and this court has no doubt that Boat/U.S., the party primarily responsible for covering Sea Tow's claim, is capable of appointing such a representative. Second, a party may resist a foreign forum selection clause by showing that the contract resulted from "fraud, undue influence, or overweening bargaining power." *Id.* at 12, 92 S.Ct. at 1914; *see* discussion supra; *see also Carnival Cruise Lines,* 499 U.S. at —, 111 S.Ct. at 1527 (discussing forum clause in cruise ticket as "contract of adhesion"); *Scherk,* 417 U.S. at 519 n. 14, 94 S.Ct. at 2456 n. 14 (discussing standard for fraud). Third, if "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision" a court may refuse to enforce the clause. *Id.* 407 U.S. at 15, 92 S.Ct. at 1916.

**10.** While *Bergesen* offers some guidance, defendant's reliance on *dicta* in that opinion to demonstrate what the Second Circuit finds "qualifies under § 202 as a foreign arbitration award" is not persuasive. *Bergesen* involved a commercial shipping contract between a Norwegian shipowner and a Swiss company; the contract contained an arbitration clause designating New York as the arbitration site. When disputes arose between the parties, arbitration took place in New York in accordance with the contract. Plaintiff unsuccessfully attempted to enforce the arbitration award in Switzerland and thereafter sought confirmation in the Southern District of New York. The question presented to the Second Circuit was whether the Convention applied to a commercial arbitration award that was rendered in the United States since the Convention by its terms does not apply to "domestic" arbitral awards.

The *Bergesen* court first examined what constituted a foreign arbitration award under the Convention and, in that context, wrote the language upon which defendants rely:

The Convention did not define nondomestic awards. The definition appears to have been left out deliberately in order to cover as wide a variety of eligible awards as possible, while permitting the enforcing authority to supply its own definition of "nondomestic" in conformity with its own national law.... We adopt the view that "awards not considered as domestic" denotes awards which are subject to the Convention not because made abroad, but because made within the legal framework of another country, e.g., pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction.

*Id.* at 932. However, in the subsequent sentence, the court went on to state:

We prefer this broader construction because it is more in line with the intended purpose of the treaty, which was entered into to encourage the recognition and enforcement of international arbitration awards, *see Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94

the deference given to forum and arbitration clauses, this court turns to the language and applicability of Section 202.

### D. *Applying the Convention*

■ A United States court determining whether the Convention applies must resolve four questions: (1) whether there is an agreement in writing to arbitrate the subject of the dispute; (2) whether the agreement provides for arbitration in the territory of a signatory of the Convention; (3) whether the agreement arises out of a legal relationship, contractual or not, which is considered commercial; and (4) whether a party to the agreement is a foreign citizen or the relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation to one or more foreign states. *See Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186–87 (1st Cir.1982); *see also Cargill Int'l S.A. v. M/T Pav Dybenko,* 991 F.2d 1012, 1018 (2d Cir.1993) ("[T]hree basic requirements must be met for a district court to find jurisdiction under the Convention: 'the award (1) must arise out of a legal relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope.' ") (*quoting Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.,* 887 F.2d 1357, 1362 (9th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1319, 108 L.Ed.2d 494 (1990)); *Corcoran v. Ardra Insurance Co.,* 657 F.Supp. 1223, 1227 (S.D.N.Y.1987) (describing above inquiry and policy behind adoption of Convention), *appeal dismissed and mandamus denied,* 842 F.2d 31 (2d Cir.1988). Should all these questions be answered affirmatively, a court *must* order arbitration unless it finds the agreement "null and void." *Riley,* 969 F.2d at 959; *Ledee,* 684 F.2d at 187; *see also McCreary Tire & Rubber Co. v. CEAT S.P.A.,* 501 F.2d

1032, 1037 (3d Cir.1974) (holding that when claim falls within scope of arbitration clause enforceable under Convention, court must refer parties to arbitration).

■ Applying this four-part test, there is no question that a written agreement to arbitrate this dispute exists, that both the United States and the United Kingdom are signatories to the Convention, and that the parties' relationship is commercial. The question to be resolved then is whether the parties or the contract bears a "reasonable" relationship with a foreign nation so as to allow Section 202 to apply. *See* H.R.Rep. No. 91–1181, 91st Cong., 2d Sess. 2, *reprinted in* 1970 U.S.Code Cong. & Admin.News 3601, 3602 ("The second sentence of section 202 is intended to make it clear that an agreement or award arising out of a legal relationship exclusively between citizens of the United States is not enforceable under the Convention in U.S. courts unless it has a reasonable relationship with a foreign state."). Neither the Joneses nor Sea Tow is a foreign citizen, the property—the MISS JADE II—is located in New York, and the salvage, towing, and storage all occurred in New York. Therefore, this agreement falls within Section 202 of the Convention only if this court finds that the LOF's selection of English law and its designation of Lloyd's of London as arbitrator constitutes a reasonable commercial relationship with the United Kingdom or indicates that the parties envisaged enforcement abroad.

The two courts to address the enforceability of identical LOF arbitration provisions both concluded that the Convention was not applicable. *See Reinholtz v. Retriever Marine Towing & Salvage,* No. CV–92–14141 (S.D.Fla. May 21, 1993); *Brier v. Northstar Marine, Inc.,* CV–91–597, 1992 WL 350292

S.Ct. 2449, 2547 n. 15, 41 L.Ed.2d 270 (1974). Applying that purpose to this case involving two foreign entities leads to the conclusion that this award is not domestic. *Id.* at 932. Finding that the Convention applied to this award, the *Bergesen* court proceeded to determine whether Section 202 of the implementing legislation—the statutory section at issue in this case—also applied to contracts between two foreign citizens arbitrated in New York; in so doing, the Second Circuit cited the legislative history of the Convention and ex-

plained that "Congress spelled out its definition of [nondomestic] in section 202. Had Congress desired to exclude arbitral awards involving two foreign parties rendered within the United States from enforcement by our courts it could readily have done so. It did not." *Id.* at 933. As this language indicates, *Bergesen* merely confirms that Section 202 governs arbitration agreements that have some relationship with a foreign state. *See also In re Dworkin–Cosell Interair Courier Services, Inc.,* 728 F.Supp. 156, 158–59 (S.D.N.Y. 1989).

(D.N.J. April 23, 1992). These cases, decided, respectively, by magistrate judges in the Southern District of Florida and the District of New Jersey, each involved vessels of United States origin and LOFs signed by the vessels' owners and the salvage companies, all of whom were United States citizens; thus, as in this case, the parties' and contracts' only connection with foreign states were the LOFs which, not surprisingly, contained identical arbitration and English law provisions. *See also Bethlehem Steel Corp. v. Songer Corp.*, 1992 WL 110735, *1, 1992 U.S. Dist. LEXIS 6890, *2 (S.D.N.Y.1992) (finding no federal jurisdiction over action seeking stay of arbitration; Convention "was not intended to confer jurisdiction on the federal courts over disputes between United States citizens solely because that dispute may have some relation to a contract one of the parties has with a foreign corporation" so one party's responsibility for constructing and installing French furnaces under supervision of French government held insufficient). As this court finds that these cases gave too little recognition to the content of the LOFs and the precise language of Section 202, it disagrees with their rationale and holds the Convention applicable.

As an initial matter, the language of Section 202's requirements is clearly disjunctive: to be subject to the Convention, a contract may envisage performance abroad *or* may envisage enforcement abroad *or* may have some other reasonable relationship with a foreign nation. In this case, not only does the LOF designate London as the arbitral forum and Lloyd's—an expert in the field of salvage—as the arbitrator,[11] but also it designates English law as the applicable law for settling this dispute. Clearly, these designations indicate that the parties contemplated enforcement of this award in Great Britain. *Cf. Wilson v. Lignotok U.S.A.*, 709 F.Supp. 797, 799 (E.D.Mich.1989) ("Since the employment contract dictates that U.S. law shall govern the enforcement of any arbitration award and further dictates that performance

of plaintiff's contractual duties shall be within the United States, the Court finds no reasonable relation between the commercial relationship existing between the litigants and Zurich, Switzerland, the proposed cite [sic] of arbitration.").

In support of the argument that the LOF envisages enforcement abroad, defendants—as did the defendants in *Brier* and *Reinholtz*—rely on *Fuller Co. v. Compagnie Des Bauxites De Guinee*, 421 F.Supp. 938 (W.D.Pa.1976). *Fuller* presented the question of whether the Convention applied to an agreement between two United States corporations for manufacture of equipment in the United States that would be shipped to and used at a plant in the Republic of Guinea. 421 F.Supp. at 939–42. Bearing in mind the text and legislative history of 9 U.S.C. § 202, the court found a sufficient relationship with Guinea to sustain jurisdiction based on affidavits which indicated that plaintiff's personnel would provide "extensive technical services" abroad. *Id.* at 942–43. In addition to concluding that the parties therefore contemplated *performance* abroad, the *Fuller* court also found a number of other foreign contacts that created a "reasonable relationship with one or more foreign states," including that the agreement provided for arbitration in Switzerland and thus envisaged *enforcement* overseas. *Id.* at 944.

Magistrate Judge Rosen found the case before him "easily distinguishable" from *Fuller* for the following reasons:

> While it is true that both parties were considered United States citizens in *Fuller*, the court in *Fuller* found the "reasonable relationship" *to exist under the performance exception not the enforcement exception*. In *Fuller*, the contract envisaged that plaintiff would provide extensive technical services in Guinea. An affidavit submitted to the court stated that the total cost of Fuller's technical representatives in Guinea was $269,562.08. Consequently, the court held that the case fell

---

**11.** The *Brier* court took judicial notice of the Committee of Lloyd's long and admirable history and tradition of being particularly suited to arbitrate the type of matters. For reasons provided in that opinion, this court likewise recognizes the expertise of that forum. *See also The Bremen*, 407 U.S. at 12, 92 S.Ct. at 1914 ("Plainly, the courts of England meet the standards of neutrality and long experience in admiralty litigation.").

within the exception due to the "substantial amount of performance of this contract in Guinea." *Id.* at 944. As stated above ... the contract in dispute was performed solely in New Jersey.

In contrast, plaintiff asserts that the enforcement of this agreement bears no reasonable relation to London, England. The fact that the parties are currently before this court to determine the enforceability of the arbitration agreement is of itself significant. Moreover, plaintiff asserts that the vessel upon which the contractor claimed a maritime lien was located in New Jersey and therefore the security posted to obtain the release of the vessel would have remained in this district subject to enforcement of a subsequent arbitration award. I agree. Accordingly, I find this district to be the proper place to enforce an arbitral award, not London, England. Additionally, unlike the facts in *Fuller,* where the contract provided for the design, manufacture and sale of equipment to be used at the buyer's plant in Guinea and for extensive technical services to be provided in Guinea, in the instant case, the only visible tie with the foreign nation is found in the language of the LOF Agreement itself.

*Brier,* slip op. at 12–13 (emphasis added). As the above-quoted language shows, however, the magistrate addressed neither the *Fuller* court's reference to the enforcement prong nor the statute's disjunctive language.

Magistrate Judge Rosen also refused to find the provisions within the contract itself—designating the foreign forum and law—as sufficient to create the necessary "reasonable relationship" with England, explaining as follows:

If I were to agree with defendants' analysis that the reasonable relationship with the foreign forum is created by the document itself, I would be allowing "the exception to swallow the rule." The only avenue which would bring this particular issue before the court is where a document has been signed by the parties, compelling foreign arbitration, and all the parties are United States citizens. Consequently, following defendants' reasoning, in every case

the parties would fall within the fourth jurisdictional exception, since the document itself would always name a foreign nation for arbitration.

I do not believe this is what Congress intended when they enacted this enabling legislation, especially in light of the Convention itself and the motivation of the United States in acceding to the Convention. The purpose of the Convention is to facilitate commercial arbitration arising out of international trade transactions.

*Brier,* slip op. at 13–14; *see also Reinholtz,* slip op. at 12–13 ("[L]ike the arbitration clause, the choice of law provision was created by the parties themselves, does not represent an independent connection with England, and simply does not infuse the parties' relationship with transnational elements of sufficient moment to invoke this Court's jurisdiction under the Convention."). Once again, however, these cases fail to recognize that the LOF specifies the applicable law in addition to the arbitral situs. *See Wilson,* 709 F.Supp. at 799 (finding no federal jurisdiction to compel arbitration under Convention after closely examining content of agreement between two American citizens to determine whether there existed any connection to Switzerland other than its designation as the contractual site of arbitration).

This court also finds that *Brier* and *Reinholtz* accord too little weight to the content of the contract between the parties. As already mentioned, the purpose underlying the LOF is to allow a salvage operation to proceed on a "No Cure, No Pay" basis while designating a predictable forum and body of law to govern any fee dispute that might arise after the operation is complete. While it is true that the parties in this dispute are both American citizens, a United States vessel was involved, and Sea Tow appears to function only in United States waters, the LOF establishes a purposeful connection to England by designating the Committee of Lloyd's as arbitrator and by specifying that the British law of salvage governs the dispute. *See Bergesen,* 710 F.2d at 932 ("We adopt the view that 'awards not considered as domestic' denotes awards which are subject to the Convention not because made abroad, but because made

within the legal framework of another country, e.g., pronounced in accordance with foreign law...."). In fact, London arbitration is just as inconvenient to Sea Tow—a domestic company—as it is to the Joneses and their insurer; it therefore is reasonable to conclude that Sea Tow did not stand to benefit from the forum-selection clause other than by the assurance that its dispute would be resolved in a consistent and expedient manner. Moreover, irrespective of whether there exist arbitral bodies in this country with analogous expertise in making salvage awards, the Joneses have failed to show that the parties' interest in having such determinations made by Lloyd's was "unreasonable." *See Roby,* 996 F.2d at 1363; *Avis Rent A Car,* 791 F.2d at 26.

In sum, based on the language of 9 U.S.C. § 202 and cases interpreting forum-selection clauses, and construing the Convention broadly so as to effectuate its purpose in furthering arbitration agreements on an international scale, *see Cargill,* 991 F.2d at 1018, this court finds that the Convention applies to the contract in dispute.

### CONCLUSION

Plaintiffs' motion for summary judgment is denied insofar as it requests a declaration that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards does not apply to the LOF in this action. As this court finds the dispute encompassed by an express and broadly worded arbitration provision in the agreement between the parties, it hereby stays this action but retains jurisdiction to enforce any award eventually rendered. *See Filanto, S.P.A. v. Chilewich International Corp.,* 984 F.2d 58, 61 (2d Cir. 1993) (district court may retain jurisdiction over action subject to Convention) (*citing Borden Inc. v. Meiji Milk Products Co.,* 919 F.2d 822, 826 (2d Cir.1990)). All other issues now before this court—including plaintiffs' substantive summary judgment motion, defendant's motion to amend its answer, and plaintiffs' corresponding request for sanctions—will proceed in England in accordance with the parties' agreement. All discovery material produced to date shall be binding in future proceedings.

SO ORDERED.